**BORDELON v. T. L. JAMES & CO., Inc.,** *

No. 4543.

Court of Appeal of Louisiana.
Second Circuit.

June 5, 1933.

Couvillon & Couvillon, of Marksville, for appellant.

N. I. Normand and W. A. Morrow, both of Marksville, for appellee.

MILLS, Judge.

In this action plaintiff seeks to recover the sum of $3,825 for personal injuries and incidental damages arising out of a collision between his Ford car, being driven by a negro driver, and a motortruck owned by defendant company, being driven in the opposite direction, allegedly in the course of his employment, by Joseph Lambert, its employee. The proximate cause of the damage is alleged to have been the negligence of Lambert in driving the truck at night without lights and, in suddenly swerving to the left toward plaintiff's car, confusing his driver.

Defendant denies that Lambert at the time of the accident was engaged in its service or was using the truck with its consent. It denies the acts of negligence relied upon by plaintiff and asserts that the proximate cause of the collision was the negligence of plaintiff in operating his car on the wrong side of the road without proper lights, at an unsafe speed, and without keeping a proper lookout.

In the alternative, that the above acts of negligence on the part of plaintiff at least. constitute contributory negligence.

In the lower court, there was judgment for plaintiff in the sum of $2,075. From this judgment defendant has appealed, and plaintiff has answered the appeal asking that the allowance for pain and suffering be increased from $250 to $500, and that the judgment be otherwise affirmed.

The accident occurred at about 7 o'clock, well after dark, on the night of October 29, 1931. While there was no moon, the night was clear. The place of collision was on a level, straight, paved stretch of the Marksville-Bunkie highway, in the parish of Avoyelles, about halfway between the villages of Marksville and Hessmer. Plaintiff's car, an old Ford, variously valued at from $25 to $65, was being driven from Marksville in the direction of Hessmer, by a negro preacher, named Horace Simmons, whose brother, Howard Simmons, was riding on the back seat. Plaintiff was seated in front beside the driver. Plaintiff's testimony is that he and the driver saw, at a distance of 30 or 40 feet, an object coming towards them on the highway from the direction of Hessmer. An immediate application of his brakes caused plaintiff's car to veer from side to side and, finally, while cutting to the right, to strike with its left front wheel and fender the left-hand corner of the radiator of the oncoming truck. The force of the impact caused the car to turn over on its side, throwing plaintiff forward against the windshield, his hands crashing through and being severely cut by the broken glass.

As to the position of the vehicles, plaintiff says: "He was coming on his side, I on mine." He estimates that the cars collided about 1 foot from the center of the road, but does not say on which side of the center. The negro driver says he saw an object, which he first took for a wagon, coming rapidly towards him at a distance of 30 or 40 feet away; that, when he got within 20 feet, he realized that it was a car and mashed down the brakes. He says: "I was going to the right of the road and noticed it was coming towards me, therefore, I went to the left and became confused—and that is when I became confused. He was just coming about the center of the road like I was, with both front wheels about on the center line."

He testified further that, though his lights

were burning, he did not have time to avoid the accident by stopping; that the apparent inclination of the truck to turn towards him was the cause of the collision.

Howard Simmons says the lights were not as strong as might be. From the back seat,. he saw the truck approaching rather rapidly at a distance of about 35 or 40 feet ahead. He says that both cars were traveling about the center of the road, and that, when the car slowed and turned to the right to dodge the truck, the truck seemed like it was going to move to the right towards them, and that, "before we could cut to the right, that is when we were struck." According to his statement, the car did not swerve or turn at any time to the left.

The version of Joseph Lambert, the driver of the truck, is that his lights went out beyond repair when he was three-quarters of a mile from the place of collision; that on this account he was traveling slowly at an estimated speed of 12 or 15 miles per hour and on his right-hand side of the road; that, when he reached a point opposite the home of his father, he came to a full stop, still well on his right-hand side of the road, and whistled for his wife. He then saw plaintiff's car coming, without lights, at a speed of about 25 miles per hour; that it did not seem to slow up and did not turn to the right until within 6 or 8 feet of him, the left front wheel of the car striking the left front of his radiator, the force and direction of the impact pulling the front of the truck towards the center of the road.

The record discloses the following physical facts:

The left front wheel of each car was crushed; the left front of defendant's radiator was mashed in. After the accident, the car was turned over on its right side, to the left of the truck, its body being wholly on the pavement, its front variously estimated at from 4 feet back of to even with the rear end of the truck, the body of the car angling towards its right-hand edge of the pavement. The truck was standing on its right-hand side of the road, the rear right wheel on the pavement near the right-hand edge and the left front wheel close to, but not over, the center line.

The position of the left front wheel of the truck is one of the contested points in the case. There is some testimony that it was a few inches over the center, but we find that a large preponderance fixes its position as wholly on its right-hand side of the road, though close to the center. The wheels of the truck were slightly turned towards the center line.

The only witness testifying as to the tracks of the car says that they, and the oil and dirt knocked off the car by the impact, show that the cars were squarely facing one another on defendant's half of the road up to within 10 feet of where they collided; that at this point the tracks show that plaintiff's car swerved to the right and struck the truck.

The road is surfaced over a width of 18 feet, with 3-foot shoulders on each side, flanked by a shallow ditch. There was ample space for plaintiff's car to pass to the right of the truck, with perfect safety.

It is admitted that defendant's truck was without lights. It is amply proved that it was wholly on its side of the road when it was struck. Though its left front wheel was near the center, we are satisfied that it was not across, and that the front wheels had been pulled or knocked to some extent towards, and turned slightly in the direction of, the center by the natural force and direction of the impact.

■■ We do not see how defendant's truck could have swerved appreciably, as claimed by the witnesses for plaintiff, all of whom testify that, as the cars approached each other the left front wheel of the truck was about the center of the road. If, after the collision, it was still practically in that same position, the truck could not have swerved. We are inclined to believe the testimony of Joseph Lambert, though it is strongly contradicted, that he had stopped, or had slowed down, opposite his father's house. It is natural that he should have done so. Had he been traveling at the speed testified to by plaintiff's witnesses, the results of the collision would have been much more disastrous, and the truck would not have stopped in its tracks. We are further satisfied that, though plaintiff had lights, they were none too strong; that his car was traveling on its wrong side of the road at a speed of about 25 miles per hour; that his driver did not attempt to get back on his proper side of the road until within 20 feet, or less, of the truck. He is bound to have been well on the wrong side of the road. Had the two cars been traveling each with its left front wheel on the center line, the slightest swerving on the part of plaintiff would either have avoided the collision or caused his car to have been struck on the side, rather than towards the front. The truck, being on its side of the road, could not have been struck on the front of its radiator by a car swerving to the right unless the car was considerably on its left-hand side when it started to swerve. Besides being on the wrong side of the road, plaintiff's driver was either not keeping a proper lookout or was traveling at a speed unsafe for the strength of his lights. That he did not see the truck at all until within 30 or 40 feet of it, and did not recognize its character until within 20 feet, makes this conclusion inevitable.

A defendant, though negligent, cannot be held liable in damages unless his negligence is the proximate cause of the accident. We

think that the above acts of negligence on the part of plaintiff and his driver, under his control, were, if not the immediate proximate cause of the accident, at least constitute contributory negligence and bar his right to recovery.

A case directly in point is that of L. S. Frierson v. Shreveport Grocery Company, 3 La. App. 44, wherein plaintiff's car, with lights, being driven on its wrong side of the road at a speed of from 20 to 25 miles per hour, collided with defendant's car, which was without lights, and was being driven at a speed of from 3 to 4 miles per hour, on its right side of the road. In this case each party was found negligent and denied recovery. See, also, Sexton v. Stiles, 15 La. App. 148, 130 So. 821; Baden v. Globe Indemnity Company (La. App.) 146 So. 784; General Exchange Ins. Corp. v. Caraccio (La. App.) 144 So. 630; Riser v. Schreiber, 4 La. App. 340; Edwards v. Cappel Motor Company, 8 La. App. 344; Ford, Bacon & Davis, Inc., v. Shaw, 8 La. App. 751; Goodson v. Schuster's Wholesale Produce Co., 10 La. App. 486, 120 So. 689; Bazile v. J. F. Landry & Company, 10 La. App. 747, 122 So. 901; Lacy v. Lucky et al., 19 La. App. 743, 140 So. 857.

■ The driver of an automobile is negligent if unable to stop within the range of his vision. Quatray v. Wicker, 16 La. App. 515, 134 So. 313; Parlongue v. Leon, 6 La. App. 18; Raziano v. Trauth, 15 La. App. 650, 131 So. 212; Baden v. Globe Indemnity Company (La. App.) 146 So. 784.

■ A motorist must keep a proper lookout ahead according to the situation which confronts him. Safety Tire Service Company v. Murov, 19 La. App. 663, 140 So. 879.

■ Generally, a driver of an automobile is negligent when he collides with a vehicle parked without lights on the right side of a road. Waters v. Meriwether Transfer Company, 18 La. App. 18, 137 So. 578.

His negligence is much greater where he, while driving on the left or wrong side of the road, collides with a truck without lights.

■ In his original petition, plaintiff contented himself with the allegation that the truck was owned by T. L. James & Company and was operated by Joseph Lambert, its employee, while in the course of his employment. Defendant excepted that this allegation failed to state a cause of action. After the exception was argued and submitted, but before it was passed upon, plaintiff amended by adding that Lambert's employment consisted of driving the truck for the purpose of hauling water for making amiesite to pave the road, and also for the purpose of going to his work and returning to his home from day to day. After the filing of the amended petition, the exception was overruled. We think

this ruling correct. If plaintiff could prove that by agreement his employment commenced when he left home in the morning and did not cease until he had returned home at night, the responsibility of his employer would be established.

■ Defendant company was engaged in laying amiesite paving on the highway from Coulee des Grues, just out of Marksville, to Bunkie. At the time of the accident, the paving begun on the Marksville end had been completed to a point beyond Hessmer in the direction of Bunkie. Many of the workmen lived along the road from Hessmer to Marksville. The company employed one Housley Guillot to carry these men to and from their work, in his truck, which he also used during working hours to haul amiesite. In laying this type of paving, the subgrade is first prepared. In wetting it down, bayou or any available water is suitable. After the bed is prepared, the forms are set and the amiesite paving is laid, leveled, and allowed to partially cool. After the proper interval, it is rolled with heavy steam rollers and then sealed from the weather by spraying asphalt over the surface through a hose and nozzle. Surface water cannot be used in the steam rollers and other engine driven machinery. For this use the company employed three tank trucks to haul deep well water. Joe Lambert's job was limited to operating one of these trucks. At the inception of the work, this water was obtained from the municipal water works in Marksville. Then, as the paving progressed away from Marksville, from wells in Mansura. At the time of the accident, the work had advanced to Bayou du Lak, beyond Hessmer in the direction of Bunkie, the water for the machinery being furnished entirely by the Union Oil Mill at Bunkie. The working hours on the job were from 6 a. m. to 6 p. m. On the day of the collision Lambert was detained by his work later than the rest of the crew, and, when he was released, the Guillot truck had departed with the men. Lambert, rather than walk three miles to his home beyond Hessmer, took the truck.

Plaintiff endeavored to prove that it was part of Lambert's duty to fill the truck at night so that the rollers would be supplied with water the first thing in the morning. Many of his neighbors, presumably friendly, testified that they had ridden to and from work with him in the truck many times. Others had seen him pass. One says that Lambert left the truck in his yard at night. But not one testified that he was ever seen to fill it with water. His homeward journey the night of the accident was in the opposite direction from the source of supply in Bunkie. The tank truck drivers had ample time after the work started in the morning to get water from Bunkie before it was needed by the

rollers. No night work had been done by the crew since leaving the vicinity of Marksville. The evidence entirely fails to show that, in using the truck for his transportation, Lambert was performing any service for his employer.

Up to about ten days before the collision, Lambert had been using this truck in going to and from his work. That this was done with the knowledge of his employer is not specifically proved, but must be inferred from the surrounding circumstances. Ten days prior to his collision with plaintiff, the bookkeeper in the office of the company discovered that Lambert's truck was consuming an excessive amount of gasoline. This was reported to James Wilkinson, the assistant superintendent actively in charge of the whole work, who immediately ordered Lambert not to use the truck after working hours. He gave instructions that it was to be left in the Fontaine garage at Hessmer, a part of which had been rented by the defendant company for the purpose of storing its cars. The preponderance of the testimony is that during these ten days the truck was left as ordered, Lambert using the Guillot truck or catching a ride to get home from work. Finding himself marooned on the night in question, Lambert admits that he violated his orders by using the truck. That he did so is indicated by the fact that he was required to repair the damage to the truck at his own expense. He does not appear to have suffered any further penalty for his disobedience of orders. No significance can be attached to the fact that some time after the accident he kept the truck nightly at his house because at that time he had moved to a place between Bayou du Lak and Hessmer; having to pass his home on the way from work to the place of storage at Hessmer, it was reasonable for him to stop and park the car at his home.

Much importance is attached by plaintiff to defendant's failure to produce Guillot, the driver of the transfer truck, to prove that Lambert rode in it the ten days prior to the accident. We do not think the rule that failure to produce an essential witness creates a presumption that his testimony would be unfavorable is applicable in this instance. The work had long ceased and Guillot was not in the employ nor under the control of defendant. It is not shown that he was available, and, if available, he was as much so to plaintiff as to defendant. In any event, the presumption could not prevail over the positive testimony.

Also plaintiff complains that Anderson, foreman of the amiesite crew, was not produced to prove that Lambert did not have his permission to use the truck. At the time of the trial, Anderson is shown to have been in Florida. It is not proven that he was then in the employ of the company. He was subordinate to Wilkinson and without authority to authorize Lambert to take the truck for his personal use. We conclude that, at the time of the collision, Lambert's employment by defendant company had ceased for the day; that he was not using its truck in any service for the company, but was using it without its consent and against its express orders, solely for his own purpose and convenience. Upon such a finding of fact it is not necessary to cite any further authority other than that part of article 2320 of the Revised Civil Code which provides: "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

The many cases cited arising under the Workmen's Compensation Act are not in point, being governed by its provisions and not by the general law.

For the reasons above assigned, the judgment of the lower court is avoided and reversed, and plaintiff's demand is rejected, with costs of both courts.